IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| OREN TAVORY, | |
| Plaintiff, | |
| v. | Civil Action No.: 3:06–CV–628 |
| NTP, INC., | |
| Defendant. | |

**MEMORANDUM OPINION**

This matter comes before the Court on Defendant NTP's Motion for Summary Judgment, filed as Docket Entry No. 85, pursuant to Federal Rule of Civil Procedure 56. On September 20, 2006, and in the wake of the notorious and protracted BlackBerry litigation, NTP, Inc. v. Research In Motion, 3:01–CV–767, Plaintiff Oren Tavory brought this civil action to be joined as an inventor with respect to six certain patents.[1] Additionally, Counts VII and VIII of the Complaint sought damages for copyright infringement and unjust enrichment, respectively. By Memorandum Opinion & Order dated December 26, 2006, Count VIII was dismissed. (Docket Entry No. 42.) NTP then moved for summary judgment as to the remaining counts, and by Order dated May 16, 2007, that Motion was granted. (Docket Entry No. 105.) This Opinion has been issued to explain that disposition.

---

[1] These patents are referred to in passing as the patents-in-suit, and they are: (1) U.S. Patent No. 5,436,960 ("the '960 patent"); (2) U.S. Patent No. 5,438,611 ("the '611 patent"); (3) U.S. Patent No. 5,625,670 ("the '670 patent"); (4) U.S. Patent No. 5,631,946 ("the '946 patent"); (5) U.S. Patent No. 5,819,172 ("the '172 patent"); and (6) U.S. Patent No. 6,067,451 ("the '451 patent"). The first six counts of the Complaint request that the Plaintiff be joined as an inventor as to each corresponding patent.

## I.

In the latter years of the 1980s, Oren Tavory became employed as an independent technical consultant with Telefind, a telecom concern that was then engaged in the operation of a nation-wide paging network. While affiliated with Telefind, the Plaintiff was assigned to a project that purposed to merge portable computing with emerging pager technology. The objective of that project was to create the first commercially viable, wireless-enabled laptop computer. Telefind subcontracted with ESA, a manufacturer of electronic hardware components, to assist with construction. The President of ESA was Tom Campana, a gentleman who moonlighted with Telefind as an executive officer. Mr. Campana was involved extensively in the laptop project, as were two of ESA's programmers, Mike Ponschke and Gary Thelen. The Plaintiff came to know these men through that association.

Initially, their work met with some success. Email was effectively sent through Telefind's pager network to destination processors—the pagers, which then transmitted those messages to laptop computers to which they were connected. For reasons that are not relevant to these proceedings, however, the laptop project was abandoned. By early 1991, Telefind had discontinued funding, and Tavory had sought other employment.

At about the same time, Mr. Campana, Mr. Ponschke, and Mr. Thelen filed a joint application with the United States Patent & Trademark Office for what is described as an "electronic mail system." It is the Court's understanding that this system and its associated technology were developed in the course of the laptop project. Eventually, the PTO approved the application and a patent was issued.[2] Over the coming years, these men would apply for and be

---

[2] This was the '960 patent.

granted at least five more patents, each involving electronic mail systems or related technology. Together, these six are the patents-in-suit.

In 1992, Mr. Campana co-founded NTP, a Virginia-based corporation that is principally engaged in the business of holding telecom patents for licensing to third-party manufacturers. It is estimated that NTP's portfolio contains fifty or more active patents. The patents-in-suit are among NTP's holdings.

In 2001, NTP brought an action for infringement against Research In Motion, the manufacturer of the wireless handheld device BlackBerry, with respect to a number of patents that included the patents-in-suit in the instant proceedings. That case was litigated before this Court, and Tavory was deposed in connection with his work at Telefind. In the course of his deposition, the Plaintiff identified portions of source code in the patents-in-suit that he had allegedly authored. At no time, however, did he assert the existence of a copyright in the code, nor did he offer any proof of authorship or ownership.

BlackBerry lingered in the courts for nearly five full years. It was not until the early months of 2006 that a settlement between the parties was reached.[3] Mr. Campana never lived to see that day, though; he had passed away two years earlier.

Soon after BlackBerry's settlement, Tavory submitted an application for copyright registration as to the portions of the source code he had claimed to author. Then on September 20, 2006, this action for co-inventorship was filed. The Plaintiff's allegations in this matter are twofold. First, that he is the author of the source code that was used to "push" an item of email onto the paging network for delivery. This is referred to periodically as the Push Software. His

---

[3] NTP settled all infringement claims against Research In Motion for $612.5 million.

second allegation is that through neglect or design, his name was omitted from the patent applications. He seeks to be established as the copyright owner of the Push Software, to be recognized as a co-inventor of the patents-in-suit, and damages appertaining to the infringement of those rights.

## II.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The non-moving party may not rest upon mere allegations or denials contained in his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The facts of this matter, as well as any reasonable inferences to be drawn from those facts, have been construed in the light more favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "Summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented." Id. at 247–48.

## III.

The claim before the Court consists in part of an action for direct copyright infringement. To prevail, the copyright holder must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see also ALS Scan, Inc. v. RemarQ Cmtys., Inc., 239 F.3d 619 (4th

Cir. 2001). There is also a jurisdictional limitation. A copyright must be registered prior to the institution of an action for infringement. 17 U.S.C. § 411(a); Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 283 (4th Cir. 2003). "[T]o obtain a copyright registration, an applicant must deposit as part of his application a 'copy' or 'copies' of the work." Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1211 (9th Cir. 1998)(citing 17 U.S.C. § 408(b)(1),(2)). Not just any kind of copy will suffice, though; only originals or "bona fide copies" are acceptable. See Seiler v. Lucasfilm, Ltd., 808 F.2d 1316 (9th Cir. 1986); see also Coles v. Wonder, 283 F.3d 798 (6th Cir. 2002); Geoscan, Inc. v. Geotrace Techs., Inc., 226 F.3d 387 (5th Cir. 2000); Kodadek, 152 F.3d 1209. A bona fide copy is one that is "virtually identical to the original" and was "produced by directly referring to the original." Kodadek, 152 F.3d 1211. In contrast are "reconstructions," documentary evidence of putative copyrights that are created without reference to original works or bona fide copies. See, e.g., Seiler, 808 F.2d 1316 (9th Cir. 1987).

    The Copyright Act is wisely disdainful of reconstructions. One need look no further than to Kodadek, 152 F.3d 1209 (9th Cir. 1998), for an illustration. In 1993, MTV aired *Beavis and Butt-Head*, an animated series that centered on two Texas teens and their penchant for petty vandalism, music videos, and "chillaxin'." The cartoon was an instant success. Among its viewers was the plaintiff, Kodadek. He claimed that the characters Beavis and Butt-Head were his ideas, that he had conceived their characters in 1991, and that the show's creator, Mike Judge, had stolen his concepts. Kodadek filed for a copyright registration in 1993, and submitted in connection with his application copies of sketches of the characters Beavis and Butt-Head. Not only were these sketches drawn that same year, they were made after Kodadek had seen the show. The plaintiff also backdated his application to indicate that "the year in which his work

5

was created" was 1991. The Copyright Office issued a certificate of registration, and Kodakek followed with an action for infringement against MTV and Mr. Judge. Summary judgment was entered against the plaintiff, in relevant part for his failure to obtain a valid copyright registration, and affirmed on appeal.

This is precisely the type of fraudulent claim that the Copyright Act seeks to frustrate. In one sense, the deposit requirement serves a gatekeeping function. Effective registration of a copyright is predicated on the submission of some objective indicia of an individual's authorship. In another sense, the requirement serves an evidentiary function. The copies that are submitted in connection with an application for registration then become part of a record by which claims of infringement are tested. The utility of these functions, as well as our confidence in the integrity of the copyright system, breaks down when recollection is tolerated. That is because memories are inherently unreliable. They are susceptible to influence and subject to change. Time is especially corrosive, and the more time that passes, the more our memories fail. These are simple facts of life, and the Copyright Act deals with these facts by not dealing with them at all. For the purpose of the deposit requirement, the degree to which the registrant relied on his memory does not matter. The Copyright Act does not countenance the validity of any deposit copy that was made with even the slightest reference to recollection. Kodadek, 152 F.3d 1209; see also Coles, 283 F.3d 798 (9th Cir. 2002); Seiler, 808 F.2d 1316 (9th Cir. 1987). To hold otherwise would yield a system fraught with fraud and deceit. Seiler, 808 F.2d at 1322.

And that is why Tavory's deposit copy is insufficient as a matter of law. It is admitted that no original copies of the source code dating from 1990 remain. The Plaintiff was able to produce his deposit copy only by referring to modified versions of the code and redacting those

modifications to the best of his recollection in order to create an "original." Unsurprisingly, when the source code introduced with his copyright application was tested, it failed to perform as the 1990 version of the Push Software had.

  Tavory insists that these considerations are irrelevant. It is suggested that a bona fide copy of an original work need not be a carbon copy, and that is true. A copy submitted for deposit is sufficient if it is "virtually identical" to the original; minor errors or discrepancies in the application will generally not avoid registration. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 486–87 (9th Cir. 2000). Tavory has characterized the differences between the operational and non-operational source codes as "slight," consisting of misspelled words, syntactical errors, or misplaced punctuation marks. The Court is not in a position to assess the veracity of these representations, nor is it inclined to do so at this stage in the proceedings.

  The more fundamental infirmity in the Plaintiff's registration arises with respect to his reliance on later versions of the source code. To begin with, it is undisputed that these later versions had evolved from the content of the original, picking up a number of additions along the way. The Plaintiff claims to have redacted these additions as he drafted the deposit copy of his registration, leaving only code that he had authored in 1990. Such redaction was not performed with reference to some other document, but solely from the Plaintiff's recollection. Certainly, "[o]nce a bona fide copy is made . . . , subsequent copies can be made by directly referring to that copy." Kodadek, 152 F.3d at 1212. But there must first be a bona fide copy from which to effect reproduction, and that is noticeably absent.

  Instead, Tavory created a reconstruction that relied in substantial part on his memory and submitted that reconstruction in connection with his application. His attempt at registration is

therefore invalid, and this Court has no choice but to dismiss the action for infringement for lack of subject matter jurisdiction. Xoom, Inc. v. Imageline, Inc., 323 F.3d 279 (4th Cir. 2003); see also Coles, 283 F.3d 798 (9th Cir. 2002); Seiler, 808 F.2d 1316 (9th Cir. 1987).

Even if this Court were to have jurisdiction in the action for infringement, the Defendant has raised additional arguments that militate toward granting summary judgment. The first of these is equitable estoppel. To avail oneself of the estoppel defense, it must be shown: (1) that the plaintiff had actual or constructive knowledge of the truth of a matter; (2) that he misrepresented or concealed material facts to the defendant; (3) that he intended or expected the defendant to rely upon those misrepresentations or concealments; (4) that the defendant did so act; and (5) that his reliance was both reasonable and detrimental. See Elmore v. Cone Mills Corp., 187 F.3d 442, 446–47 (4th Cir. 1999)(citations omitted); Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 689 (4th Cir. 1992)(citation omitted). The truth of the matter at issue in the instant proceedings is, of course, the authorship of the Push Software; the concealment, Tavory's long-standing silence as to his role in that authorship;[4] and the reliance, the frustration of NTP's ability to resolve attacks against the integrity of the patents-in-suit in one fell swoop,

---

[4] The Push Software was conceived in 1990. Tavory was deposed in connection with BlackBerry in 2002. At no time during that 12-year period did the Plaintiff assert his authorship. Nor was the issue of authorship raised in 2002 when Tavory was confronted with a copyright claim that was inconsistent with his own (Pl.'s 2002 Dep., 26), or in the four years that followed.  In fact, the first time that Tavory claimed to be the author of the source code was in 2006, after Mr. Campana had passed away, and after a healthy settlement between NTP and Research In Motion had been reached.

principally through BlackBerry.[5] The Plaintiff's delay in asserting his authorship has been excessive and unreasonable, and no satisfactory explanation has been offered.

The Court is deeply troubled by these circumstances. There are few coincidences in life, and the timing of Tavory's assertions is far too convenient to avoid suspicion. Not only did the Plaintiff wait until after the death of Mr. Campana, who would surely have been a material witness, to stake his claim, the copyright registration was not filed until after NTP had entered into a nine-figure settlement with respect to the patents Tavory says infringe his rights. Despite these serious infirmities, the most damning evidence has been rendered by the Plaintiff himself. He has been deposed twice. On the first occasion, in 2002, Tavory testified that he could not remember whether he wrote the Push Software at Mr. Campana's direction, or to what extent he was involved in the authorship of the source code. (Pl.'s 2002 Dep. passim.) Four years later, the Plaintiff sat for another deposition, this time in connection with the present matter. In spite of the fact that it was then 2006, and that he was testifying about events that had happened 16 years previously, Tavory's memory was much clearer. (Pl.'s 2006 Dep. passim.)

It is said that "[e]quitable estoppel may deprive a plaintiff of an otherwise meritorious copyright infringement claim." Service & Training, 963 F.2d at 689. The force of equity is no

---

[5] The Defendant alleges that "if Tavory had timely asserted a claim that reproduction of the published [patents-in-suit] during the course of the patent litigation constituted infringement, NTP could and would have taken a number of steps that would have eliminated all such allegations," (Def.'s Br. in Support of Mot. for Summ. Judg., Docket Entry No. 86, 24), thereby obviating the need for the instant litigation.

less potent against claims that have no merit. Were this claim legally competent, equity would compel dismissal with all due haste.[6]

The Defendant's remaining arguments as to copyright infringement address portions of the claim that should be dismissed, rather than the claim as a whole. The first argument is fair use.[7] It is alleged that NTP committed infringement "by licensing rights in the Push Software and / or in the Patents, inviting others to copy the Push Software, reproducing the Push Software, . . . making electronic copies of the Push Software[,] asserting ownership of the Push Software[,] and purporting to authorize others to exercise the exclusive rights in the Push Software." (Compl. ¶ 41.) Tavory is not seeking damages for all acts of infringement that may have occurred since 1990; indeed, he cannot. Such a claim is expressly precluded by statute.[8] We are therefore concerned only with acts that may have occurred on September 20, 2006, the date on which this action was filed, or during the preceding three years.

Between 2003 and 2006, the Defendant was engaged in an action for patent infringement against Research In Motion. In the course of that litigation, copies of the patents-then-in-suit were made and distributed to the parties, to their experts, and to the Court. Those patents are

---

[6] It should be noted, for the sake of thoroughness, that the doctrines of laches and judicial estoppel would also have led to the same disposition.

[7] "The fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 106. Fair use exists as an affirmative defense to copyright infringement. See, e.g., Louis Vuitton Malletier, S.A. v. Haute Diggity Dog, LLC, 464 F. Supp. 2d 495 (E.D. Va. 2006). It is argued that NTP waived this defense by neglecting its mention in the answer. However, the Court has been fully briefed by both parties on the matter, and it was addressed at the hearing on the Motion for Summary Judgment.

[8] "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).

alleged to have contained the source code for the Push Software, and it is the reproduction of that code during litigation for which Tavory seeks damages, at least in part.

There is some debate as to whether the reproduction of copyrighted material for the purposes of litigating an infringement action is a fair use. In order to determine whether the use made of a work is a fair use, the Court defers to the statutory guidelines and examines: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Upon due consideration of these aspects, the Court is of the opinion that the litigation-related conduct giving rise to the opportunities for which the code was copied was a fair use. At issue in BlackBerry was the security of NTP's patents; the adjudication of that dispute required the reproduction and dissemination of the patent applications, which necessarily set forth the code that Tavory claims to have authored. In addition, and despite the Plaintiff's suggestions to the contrary,[9] the character of the use was not commercial, nor was the potential market for or value of the software source code impaired. To the extent that the code was reproduced in anticipation of or preparation for litigation, that use was a fair use and there can be no liability for infringement.[10]

---

[9] "NTP has transformed the courtroom into its boardroom." (Pl.'s Br. in Opp. to NTP's Mot. for Protective Order, Docket Entry No. 76, 2.)

[10] The Plaintiff has cited authority for the proposition that the use of copyrighted material in the course of litigation may fall outside the ambit of fair use, and thus expose the party who uses the copyrighted material to liability for infringement. See, e.g., Images Audio Visual Prods. v. Perini Bldg. Co., 91 F. Supp. 2d 1075 (E.D. Mich. 2000). The Court does not presume to announce a rule that categorically shields litigants from copyright liability through fair use. But where, as here, the works produced before the Court are material to the litigation, and where the party offering

It is further alleged that acts of infringement were committed separate and apart from the context of litigation. In the three years spanning 2003 to 2006, the source code for the Push Software was copied and distributed with regard to matters wholly unrelated to any pending litigation, but only as a constituent part of the patents that it serviced.[11] The issue with respect to this claim is not as to liability, but as to damages. Summary judgment is appropriate as to damages for infringement if the complainant offers only speculation as to the existence of a causal connection between the alleged infringement and any consequent revenues. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522–23 (4th Cir. 2003). Pursuant to an Order from this Court, NTP examined its files for the three-year period in question to determine whether any revenue could be attributed to its licensing of the patents-in-suit. None was identified. (Def.'s Memo. in Support of Mot. for Summ. Judg., Docket Entry 86, 13.) In opposition, the Plaintiff has offered certain expert testimony in order to show that there is some attributable revenue. After having considered the character of the testimony to be offered, though, the Court is convinced that it would be tremendously speculative and therefore wholly unhelpful.

---

production of the work has done so without notice or knowledge of another's claim to copyright, the equities are in favor of fair use.

[11] "[P]atent and copyright laws protect distinct aspects of a computer program. Title 35 protects the process or method performed by a computer program; [T]itle 17 protects the expression of that process or method. . . . If the patentable process is embodied inextricably in the line-by-line instructions of the computer program, . . . then the process merges with expression and precludes copyright protection." Atari Games Corp. v. Nintendo of Am., Inc., 975 F.2d 832, 839–40 (Fed. Cir. 1992)(citations omitted). The Defendant has not argued that the copyrightable elements of the patents-in-suit have merged into the patents themselves, and so the Court presumes that the intellectual property rights remain distinct.

Ultimately, of course, that issue need not be resolved. The Plaintiff's action for copyright infringement is subject to dismissal on summary judgment on the bases of both law and equity.

### IV.

The final set of claims before the Court arises in connection with the six disputed patents, for each of which the Plaintiff seeks his name to be joined as a co-inventor.[12] There is a strong presumption that those named in an issued patent are the true and correct inventors. Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997). That presumption is not easily overcome.

The touchstone of inventorship is conception, Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1227–28 (Fed. Cir. 1994), which is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is from that time to be applied in practice. Stern v. Trustees of Columbia Univ., 434 F.3d 1375, 1378 (Fed. Cir. 2006)(internal quotations and citation omitted). "[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention." Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997). "This requires more than merely exercising ordinary skill in the art," Caterpillar Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1377 (Fed. Cir. 2004), but an amount of contribution that is reasonably substantial. There is also an evidentiary requirement. Conception must be corroborated, preferably through evidence of a

---

[12] "Whenever . . . through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may . . . issue a certificate correcting such error. . . . The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly." 35 U.S.C. § 256.

contemporaneous disclosure that would enable one skilled in the art to make the invention. Burroughs Wellcome, 40 F.3d at 1228. These aspects, conception and corroboration, must be proven by clear and convincing evidence.[13] Hess, 106 F.3d at 980.

This is an exacting burden, and it has not been carried. To begin with, conception is not a matter that may be simply assumed. The party seeking to be joined as an inventor must offer some evidence that his contribution to the patent was more than of the type of normal skill that would be expected of someone who is skilled in the art. Fina Oil, 123 F.3d at 1473. During BlackBerry, Mr. Campana testified that the Plaintiff was among a pool of computer programmers employed in the course of the research and development of the Telefind laptop project. (Blackberry Trial Tr. 140–43.) These programmers wrote code at Mr. Campana's direction, and at the direction of Mr. Thelen and Mr. Ponschke. The Plaintiff did not attempt to rebut these assertions. He testified under oath in 2002 that he could not "remember one way or the other" as to whether he worked under the direction of Mr. Campana in 1990 (Pl.'s 2002 Dep. 45), and the Court is unaware of any position taken by the Plaintiff as to his membership in a pool of Telefind programmers in which all may have participated, to some degree, in writing code.

Corroboration has been equally problematic. Tavory has offered a number of statements from individuals who claim to have seen him using a wireless data device in the early months of 1990. The Plaintiff contends that this device was a prototype of the technology that Telefind wanted to cultivate for use with laptops, that he wrote the source code for this device, and that it was this code which evolved to become the Push Software. It should be noted that Tavory's

---

[13] A more demanding standard of review is required in this matter, as "[t]he inventors as named in an issued patent are presumed to be correct." Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997)(citation omitted).

device was technologically distinct from the wireless email systems that Mr. Campana and his associates patented, the most significant difference being that Tavory's device was not capable of receiving wireless email transmissions. And just as the Plaintiff did not retain any copies of the source code he had written in conjunction with the Telefind project, he did not retain any information pertaining to the authorship of the code he wrote for his prototype device. In short, there is no credible evidence that can be offered establishing that Tavory participated in the conception of the wireless email systems, nor is there credible evidence that can be offered to corroborate his claim. No reasonable jury could find in the Plaintiff's favor given this evidentiary dearth. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**V.**

For the foregoing reasons, summary judgment shall be entered for the Defendant as to each remaining count of the Complaint. An appropriate Order shall issue.

/s/
The Honorable James R. Spencer
CHIEF UNITED STATES DISTRICT JUDGE

ENTERED this __17th__ day of July 2007